Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| EDWIN RONDÓN PAGÁN<br><br>Recurrido<br><br>v.<br><br>POPULAR AUTO, LLC<br><br>Peticionario | KLCE202500404 | *CERTIORARI*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Civil Núm.: MZ2023CV01940<br><br>Sobre: Despido Injustificado |
| --- | --- | --- |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm.

Álvarez Esnard, jueza ponente

## **RESOLUCIÓN**

En San Juan, Puerto Rico, a 18 de junio de 2025.

Comparece Popular Auto, LLC ("Popular Auto" o "la Peticionaria"), y solicita la revocación de la *Resolución* emitida el 1 de abril de 2025, por el Tribunal de Primera Instancia, Sala de Mayagüez, (foro *a quo* o foro primario), notificada el 2 de abril del mismo año. Mediante la referida *Resolución,* el foro primario declaró *No Ha Lugar* la *Moción de Sentencia Sumaria* presentada por Popular Auto, en la que el Peticionario solicitó la desestimación sumaria de la Querella por despido injustificado presentada en su contra por Edwin Rondón Pagán ("señor Rondón Pagán" o "el Recurrido"), al amparo de la *Ley sobre Despido Injustificado,* Ley Núm. 80 de 30 de mayo de 1976 (Ley Núm. 80), 29, LPRA sec. 185a-185i y conforme al procedimiento sumario dispuesto en la Ley Núm. 2 de 17 de octubre de 1961 (Ley Núm. 2), 32 LPRA sec. 3118 *et seq.*

Por los fundamentos que pasamos a exponer, denegamos la expedición del auto de *Certiorari* solicitado por Popular Auto.

**I.**

El señor Rondón Pagán fue despedido de su empleo como Ejecutivo de Ventas de Popular Auto LLC. Por estos hechos, el 11 de noviembre de 2023, el Recurrido presentó *Querella* por despido injustificado ante el foro primario en contra de Popular Auto, acogiéndose al procedimiento sumario que provee la Ley Núm. 2, *supra.*[1] En síntesis, el señor Rondón Pagán alegó que comenzó a trabajar para Popular Auto el 20 de marzo de 2000 bajo un contrato a tiempo indeterminado hasta su despido sin justa causa, el 17 de octubre de 2023, mientras ocupaba el puesto de Ejecutivo de Ventas.

En respuesta, el 27 de noviembre de 2023, Popular Auto presentó *Contestación a Querella.*[2] En síntesis, sostiene que el 11 de junio de 2020, el 29 de enero de 2021 y el 24 de febrero de 2023, el Recurrido recibió amonestaciones escritas por incumplir satisfactoriamente con el presupuesto de ventas para esos años, y que el 2 de marzo de 2022 recibió una amonestación verbal. Señaló además Popular Auto que la razón para despedir al Recurrido fue no haber alcanzado las metas de ventas y/o producción que Popular Auto le fijó a los Ejecutivos de Ventas en dichos años.

Como parte del descubrimiento de prueba, el 23 de enero de 2024, Popular Auto tomó deposición al Recurrido. El 5 de marzo de 2024 este depuso al Sr. Eduardo Font Díaz, Gerente de Popular Auto y el 24 de mayo de 2024 el Recurrido tomó deposición a la Sra. Gladys Molina Rivera, representante de Popular Auto.[3]

Posteriormente, el 19 de agosto de 2024, Popular Auto presentó ante el foro primario *Moción de Sentencia Sumaria* en la

---

[1] Véase. Apéndice del Recurso, págs. 1-4.
[2] *Íd.,* págs. 7-11.
[3] *Véase Transcripción de Deposición* tomada al Recurrido el 23 de enero de 2024 a las páginas 37-253 del Apéndice de la Petición de *Certiorari, Transcripción de Deposición del Sr. Eduardo Font Díaz,* págs. 509-577 *del Apéndice y Transcripción de la Deposición* tomada a la señora Gladys Molina Rivera el 24 de mayo de 2024, a las páginas 613-691 del Apéndice de la Petición de *Certiorari.*

que alegó ausencia de controversia sobre hechos materiales que permitían la desestimación sumaria de la Querella por despido injustificado presentada en su contra por el Recurrido.[4]

En desacuerdo, el 20 de septiembre de 2024, el señor Rondón Pagán presentó *Moción en Oposición a Solicitud de Sentencia Sumaria* a la que anejó Declaración Jurada prestada por el Recurrido, en la que sostuvo que existía controversia sobre hechos materiales que impedían la adjudicación sumaria solicitada por Popular Auto, particularmente sobre la ausencia de justa causa para su despido.[5]  Arguye el Recurrido que ni el señor  Eduardo Font, como su Supervisor directo, ni la señora Gladys Molina Rivera le proveyeron asistencia ni apoyo para poder alcanzar las metas de ventas que estableció Popular Auto a partir del año 2019. Señala además, que surge de la deposición tomada al señor Eduardo Font que  este nunca le impuso sanción disciplinaria ni le imputó negligencia en el ejercicio de sus funciones así como tampoco  revisó ni cotejó las evaluaciones de desempeño realizadas al señor Rondón Pagán por supervisores previos.

Mediante *Resolución* emitida el 1 de abril de 2025, notificada al día siguiente, el foro primario declaro *No Ha Lugar* la *Moción de Sentencia Sumaria* presentada por Popular Auto.[6] En dicha *Resolución* el foro primario determinó los siguientes hechos como esenciales y pertinentes sobre los cuales no existe controversia sustancial:

### HECHOS ESENCIALES Y PERTINENTES SOBRE LOS CUALES NO HAY CONTROVERSIA SUSTANCIAL

1. Popular Auto es una empresa dedicada al financiamiento de vehículos de motor.
2. El querellante comenzó a trabajar para Popular Auto el 20 de marzo de 2000.
3. El Querellante, Edwin Rondón Pagán, comenzó a trabajar el 20 de marzo de 2000 para una empresa que en ese

---

[4] Véase. Apéndice del Recurso, págs. 12-36.
[5] *Íd.,* págs. 900-943.
[6] *Íd.,* págs. 1014-1032.

momento se llamaba Popular Leasing que es hoy la Querellada Popular Auto LLC, como Ejecutivo de Ventas en el área oeste creando una cartera de clientes.

4. Durante su empleo con Popular Auto, el querellante ocupó el puesto de Ejecutivo de Ventas.

5. El Querellante desempeñó su trabajo para la empresa Querellada con lealtad a los intereses de su patrono.

6. El Querellante desempeñó su trabajo para la empresa Querellada cumpliendo con sus normas de asistencia.

7. El producto que vendía el querellante en Popular Auto era el de contratos de arrendamiento o "leasing".

8. Los productos financieros que se pueden utilizar para el financiamiento de vehículos con residual son el leasing y el PRP.

9. El financiamiento vehículo PRP es un producto de financiamiento que lo ofrece el propio dealer.

10. El leasing que ofrece Popular Auto consiste en un plan de financiamiento que brinda al cliente el derecho a usar un activo (el auto) a cambio de realizar el pago de rentas mensuales durante un plazo determinado.

11. Como Ejecutivo de Ventas, el querellante estaba encargado de crear y retener una cartera de clientes y cumplir con las metas de ventas establecidas por la empresa.

12. Los Ejecutivos de Ventas no tienen territorios específicos asignados y pueden visitar cualquier "dealer" de autos.

13. Si bien el querellante residía en Mayagüez, este tenía completa libertad de visitar dealers y desarrollar clientes en todo Puerto Rico.

14. Eduardo Font ("Font"), Gerente de Leasing de Popular Auto, fue el supervisor del querellante desde el año 2019 al 2023.

15. El Sr. Eduardo Font fue el Supervisor directo del Querellante en el periodo de alrededor de cuatro (4) años comprendido entre el año 2019 al mes octubre de 2023, ocupando el puesto de gerente de área de leasing que es un producto de Banco Popular.

16. El Supervisor directo del Querellante, Eduardo Font Díaz, admitió que durante el periodo que fue su Supervisor nunca vio ni examinó el expediente de personal del Querellante, Edwin Rondón, para saber cuál era su desempeño previo como empleado.

17. El Supervisor del Sr. Edwin Rodón Pagán admitió que una de las funciones de su puesto como supervisor lo era evaluar la labor del personal bajo su supervisión.

18. Para evaluar la labor de los empleados bajo su supervisión anualmente, el Sr. Eduardo Font Díaz utilizaba un instrumento de evaluación preparado por Popular Leasing o Popular Auto LLC que determinaba las áreas a evaluar, así como los porcientos de valor a las áreas y métricas.

19. El desempeño de un empleado según los criterios establecidos por la empresa Querellada no estaba limitado a su volumen de ventas exclusivamente sino que los ejecutivos de venta debían cumplir con una multiplicidad de criterios como evidencia el instrumento de evaluación, siendo los mismos: (a) calidad de procesos, (b) cierre de contratos, (c) clientes nuevos, (d) actividades de venta, (e) presupuesto comercial, (f) presupuesto retail,

(g) retención de clientes, (h) Ética y cumplimiento, (i) disciplina analítica, (j) excelencia en el negocio, (k) carácter, (l) colaboración y trabajo de equipo, (m) prioridad al cliente, (n) desarrollo personal. Los criterios tienen distintos pesos para propósitos de la evaluación anual de cada empleado.

20. Las metas de venta de los Ejecutivos de Ventas se establecen tomando en consideración el presupuesto total asignado al producto para el año completo, distribuido por mes de acuerdo con el historial de ventas y las oportunidades del negocio, así como tomando en consideración lo esperado por la industria y los dealers.

21. El Supervisor Eduardo Font admitió que nunca revisó ni cotejó las evaluaciones que del desempeño del Querellante habían realizado los supervisores que le habían precedido en la supervisión del Querellante.

22. La norma para establecer la meta por Ejecutivo de Ventas era trabajar un promedio de 32 contratos mensuales.

23. Font notificaba las metas de ventas para el año a los Ejecutivos de Ventas mediante una reunión que incluía a Rondón.

24. El Querellante, Edwin Rondón Pagán, en ningún momento en sus primeros 19 años de empleo con la empresa querellada fue colocado en un Plan de Mejoramiento. No obstante, era evaluado por la empresa en una forma distinta a la manera en la que se evaluaba con posterioridad al 2020.

25. A partir de la pandemia causada por el COVID-19, los precios de venta de las unidades (automóviles) incrementaron sustancialmente.

26. Igualmente, durante la pandemia, y particularmente a partir de mayo de 2020, las ventas de autos en Puerto Rico y los leasings incrementaron.

27. Para el año 2022 y años previos, el presupuesto de ventas de leasing se dividía entre los veintitrés (23) Ejecutivos de Ventas, basado en su producción del año previo y volumen de clientes en cartera. Se establecieron diferentes metas para cada uno de los Ejecutivos de Ventas, donde la menor sería $16,000,000 anuales y la mayor $26,000,000 anuales.

28. Para el año 2022 y años previos, también se dividía la meta de ventas entre autos (presupuesto individual – 80%) y Camiones y Equipo (Presupuesto Comercial – 20%).

29. El plan de metas de ventas anuales para el año se ajustó en el 2023 para asignar a todos los Ejecutivos de Ventas la misma meta basada en una producción de 32 contratos de leasing mensuales.

30. El Supervisor, Eduardo Font, admitió que las metas o volumen de ventas exigidas al Querellante fueron aumentadas en dos (2) ocasiones en el periodo de tres años y medio que éste lo supervisó.

31. El supervisor, Eduardo Font Díaz, Supervisor directo del Querellante no era quien tomaba la determinación de asignación de cuotas de venta, el entiende que estas fueron fijadas por Arnaldo Concepción y Gladys Molina.

32. La Compañía decidió establecer la misma meta para todos los Ejecutivos de Ventas para el año 2023 para que la carga de producción fuera la misma para todos basado

en las necesidades del mercado y las metas de venta de la empresa

33. Para el 2023, el precio promedio por unidad de leasing aumentó, por lo que se estableció un presupuesto por Ejecutivo de Ventas similar para todos, de 32 unidades mensuales que representan $24,000,000 anuales, con un valor promedio por unidad de $62,500.

34. Las metas anuales asignadas a Rondón fueron las siguientes:

   a. 2019: $14,500,000 b. 2020: $14,500,000 c. 2021: $14,500,000 d. 2022: $16,000,000 e. 2023: $24,000,000.

35. La producción anual de Rondón fue la siguiente: a. 2019: $7,868,128 b. 2020: $9,398,037 c. 2021: $11,069,938 d. 2022: $8,864,085 e. 2023: $7,648,743

36. Para propósitos de su desempeño, Rondón no hubiese sido amonestado si hubiese alcanzado al menos un 70% de su meta anual de ventas.

37. Entre el año 2019 y el año 2023, Rondón nunca cumplió con sus metas de ventas, y alcanzó el 70% de sus metas de ventas en tan sólo una ocasión, en el año 2021. En el 2019 tuvo una meta de $14,500,000 de la cual logró realizar $7,868,128 en ventas para un 54%. En el año 2020 tenía una meta de $14,500,000 de la cual logro realizar $9,398,037 en ventas para un 65%. Para el 2021, tuvo una meta de $14,500,000 de la cual logro realizar $11,069,938 para un 77%. En el año 2022, tuvo una meta de $16,000,000 de la cual logró $8,864,085 en ventas para un 57%. Para el año 2023, tuvo una meta de $24,000,000 de la cual logró $7,648,743 para un 42%.

38. El Manual de Empleados de Popular Auto contiene unas normas de conducta, las cuales eran conocidas por Rondón, que a su vez incluyen ejemplos de acciones disciplinarias que establecen cuál es el tipo de disciplinar a impartirse.

39. Las normas de conducta establecen distintos niveles de acciones disciplinarias previo al despido dependiendo de la conducta y norma incumplida.

40. El Supervisor Eduardo Font admitió que nunca le impuso una acción disciplinaria al querellado por razón de que éste fuera negligente en su trabajo.

41. La norma de conducta número dos (2) establece que todo empleado deberá "[t]rabajar eficientemente conforme a las normas de calidad de Popular, a las instrucciones impartidas por el supervisor y las leyes o reglamentos que rigen el desempeño de sus funciones. Demostrar interés y sentido de responsabilidad en el desempeño del trabajo". Las ventas por el año en curso (enero a septiembre del 2023) del querellante de $7,648,743 representan un 42% del presupuesto ajustado.

42. Incumplir con la norma de conducta número dos (2) puede incluir una disciplina progresiva por incidente que puede conllevar a una primera advertencia escrita, una advertencia final y la terminación de empleo.

43. La evaluación anual de Rondón para el 2019 calificó su desempeño como "needs improvement".

44. A Rondón se le hicieron los siguientes señalamientos en la evaluación anual para el 2019, entre otros:

    a. Necesita mejorar en la métrica de cierre de contratos ya que se estaba tardando 21 días en cerrar contratos cuando debía hacerlo en menos de 15 días.

    b. Para el año 2019 Rondón obtuvo un total de 26 clientes nuevos, lo que representa un 19% de la producción esperada en esta métrica, por lo que no cumplió con el objetivo: "Edwin debe ser más agresivo en la visita a [de]aler donde se encuentra clientes nuevos".

    c. "Para el 2019, la producción fue de $7.9MM que representa un 54%, por lo tanto, no cumplió con el objetivo de su meta de $14.5MM".

    d. "Durante el año, fuiste notificado sobre tu baja producción al final de cada trimestre terminado en marzo, junio y septiembre 2019. Debes establecer y te vamos a ayudar, nuevas estrategias para fomentar el negocio con clientes nuevos. Esto se logra con visitas frecuentes a Dealers".

45. La evaluación anual de Rondón para el 2020 calificó su desempeño nuevamente como "needs improvement". 46. El Querellante obtuvo en el año 2020 una evaluación de su ejecutoria en PRESUPUESTO COMERCIAL como "Outstanding" y una evaluación de su RETENCION DE CLIENTES como "Outstanding".

46. El Querellante tuvo en el año 2020 una ejecutoria de Producción Comercial que representaba un 365% por encima del presupuesto asignado lo que fue consignado en su evaluación del siguiente modo: "Para el 2020, tu producción comercial fue de 5.3 MM que representa un 365% por encima del presupuesto asignado, por lo tanto, sobresale en el objetivo".

47. Para ese mismo año, el Querellante tuvo una ejecutoria en el renglón de retención de clientes Sobresaliente que superó la meta establecida para sobresalir de 91% logrando el Querellante un 94%, lo que consignó el supervisor en su evaluación del siguiente modo: "Para el 2020, la cartera de la Ejecutivo incrementó em -1.2MM_ que representa un 5% de aumento, En números de clientes totales se redujo 675 a 665, en factor retención de clientes existentes sacó un 94.2% por lo tanto, sobre sale en el objetivo".

48. A Rondón se le hicieron los siguientes señalamientos en la evaluación anual para el 2020, entre otros:

    a. Obtuvo una puntuación de 1 de un total de 5 puntos en la métrica de calidad de los procesos.

    b. Para el 2020 no cumplió con la métrica de presupuesto "retail", llegando al 28% del presupuesto asignado.

    c. Se le indicó que "[d]urante el año, fuiste notificado sobre tu baja producción al final de cada trimestre. Debes establecer...nuevas estrategias para fomentar el negocio con clientes nuevos...[e]sto se logra con visitas frecuentes a Dealers, llamadas a Clientes existentes/pasados y visita a distribuidores de productos Comerciales. Te recuerdo que estas en tu segundo año consecutivo como productor de bajo rendimiento ya que lograste un 65% de tu presupuesto asignado".

49. El Supervisor Eduardo Font admitió que los años 2020 y 2021 fueron años atípicos en la industria del financiamiento de vehículos porque hubo factores

externos que le afectaron, como lo fue la Pandemia de la enfermedad del COVID-19.

50. El Supervisor Eduardo Font admitió que tan real fue el impacto negativo de la Pandemia en la industria del financiamiento de vehículos que él mismo dejó tal hecho consignado en la evaluación del Querellante.

51. No empece el efecto adverso de la Pandemia en la industria de financiamiento de autos, las metas impuestas a los ejecutivos de venta de la empresa querellada no fueron reducidas.

52. Rondón recibió una "Advertencia Escrita – Desempeño" con fecha de 29 de enero de 2021.

53. A Rondón se le hicieron los siguientes señalamientos en la advertencia escrita mencionada en el párrafo anterior:

   a. "[U]sted no está cumpliendo satisfactoriamente con el presupuesto de ventas establecida lo cual es una función principal de su puesto".

   b. Para el año 2020, Rondón alcanzó una producción en ventas de $9.3MM, lo que representó un 64.81% de su presupuesto de $14.5MM.

   e. La pandemia ocasionó una merma inicial en el volumen de ventas de Popular Auto, pero el año terminó siendo uno productivo para el departamento, superando el 110% contra presupuesto, y aun así Rondón no pudo llegar al 70% de su presupuesto, la cantidad mínima esperada de él.

   f. Debido a las deficiencias observadas, a Rondón se le calificó como "low performer" o empleado con áreas de pobre desempeño.

   g. A Rondón se le indicó que su pobre desempeño "afecta el buen funcionamiento de nuestra unidad, de igual forma, representan una desviación a las Normas de Conducta del Manual de Empleado que expresan: Trabajar eficientemente conforme a las normas de calidad de la institución y de las instrucciones operacionales impartidas por el supervisor. Demostrar interés y sentido de responsabilidad en el desempeño del trabajo".

   h. A Rondón se le exhortó a "corregir de inmediato todo lo antes descrito, ya que de no observar una mejoría sustancial o de usted continuar teniendo situaciones similares o incurriendo en la misma conducta, nos veremos obligados a tomar medidas disciplinarias más estrictas".

54. Por tercer año consecutivo, la evaluación anual de Rondón para el 2021 calificó su desempeño como "needs improvement".

55. En el año 2021 el Querellante logró un Presupuesto Comercial que representó el 131% del presupuesto asignado lo que consignó su supervisor en la evaluación del siguiente modo: "Para el 2021, logró $6.0 millones que representan 131% del presupuesto de $4,35 Millones".

56. A Rondón se le hicieron los siguientes señalamientos en la evaluación anual para el 2021, entre otros:

   a. Rondón no cumplió con la métrica de cierre de contratos.

   b. Para el 2021 no cumplió con la métrica de presupuesto "retail", llegando al 51% del presupuesto asignado.

c. Se le indicó que "[d]urante este año, mejoraste tu producción para lograr un 77% de presupuesto comparado con un 65% el año pasado. Pero considero que debes mejorar en la búsqueda de más casos tanto Comercial como individuos. Considero que tú puedes, solo tienes que meterle más empeño y esfuerzo en buscar el negocio nuevo, ya sea a nivel de Dealer o a nivel de clientes existentes."

57. En ese mismo año 2021, el Querellante logró aumentar su clientela en un 27% donde el parámetro para Outstanding estaba fijado en 26% lo que consignó el supervisor en su evaluación del siguiente modo: "Para el 2021 tiene un total de: 50-Clientes Nuevos para un 27%, por lo tanto, cumple con el objetivo".

58. El Supervisor del Querellante, Eduardo Font Díaz, admitió que felicitó al Querellante por su desempeño en su evaluación del año 2021 por que el Querellante era un buen vendedor y un buen vendedor hay que felicitarlo.

59. El Supervisor del Querellante, Eduardo Font Díaz, calificó el desempeño del Querellante en el "Performance Review" como un buen año al referirse a su desempeño del año 2021. Del periodo del 2019-2023, este año fue el único año en el que querellante llego a sus números según establecidos por la compañía.

60. Por cuarto año consecutivo, la evaluación anual de Rondón para el 2022 calificó su desempeño como "needs improvement".

61. A Rondón se le hicieron los siguientes señalamientos en la evaluación anual para el 2022, entre otros:

a. Para el 2022 no cumplió con la métrica de presupuesto "retail", llegando al 29% del presupuesto asignado.

b. Rondón tampoco cumplió con las métricas de cierre de contratos y de clientes nuevos.

c. A Rondón se le indicó que "[n]ecesitas mejorar en producción y emp[e]ño en lograr cerrar más negocios. Actualmente no sales a visitar negocios y Dealres para aumentar tu producción".

d. Se le indicó que "[d]urante este año, desmejoraste tu producción para lograr un 57% de su presupuesto comparado con un 77% en año pasado de un presupuesto reducido". Véase Anejo 11, Performance Evaluation Document (2022), Year End Summary, Díaz's Comments. La segunda amonestación escrita por desempeño

62. En el año 2022 el Querellante estuvo fuera del trabajo por más de un mes lo que conocía la empresa Querellada. No empece a ello, las cuotas de venta le fueron aumentadas al Querellante de 14.5 a 16 millones y no fueron modificadas, a raíz de su enfermedad, para el año 2022.

63. El Supervisor Eduardo Font reconoce que la intervención quirúrgica del Querellante era un asunto que podía afectar su ejecutoria.

64. En el periodo de tres (3) años comprendido entre el 2020 a 2022 de los cuarenta y ocho (48) renglones en que el Querellante fue evaluado solamente obtuvo una puntación de inaceptable en solo cuatro (4) renglones. También fue calificado como "needs improvement" en otros 18 renglones.

65. Uno de los renglones en que fue calificado el desempeño del Querellante como inaceptable se refería a no haber utilizado el programa Docusign-Ev, programa del que se evaluaba su uso por primera vez y el adiestramiento para el uso de este programa se realizó en un periodo en que el Querellante se encontraba bajo una licencia médica por operación de rodillas, lo que hizo constar el querellante en su evaluación.

66. En el renglón de "Calidad de Procesos" el Querellante luego de recibir la calificación de "Unacceptable" recibió las calificaciones de "Effective" y "High Effective".

67. La Supervisora Gladys Molina Rivera admitió el que el Querellante tuviera un volumen de ventas por debajo de lo establecido por la empresa Querellada no quiere decir que no pusiera empeño en su trabajo.

68. La Sra. Gladys Molina Rivera admitió que nunca ejerció funciones de supervisión directa de la labor del Querellante.

69. La Sra. Gladys Molina, admitió que desconoce que asistencia, si alguna, le fue prestada al Querellante Edwin Rondón por su Supervisor Directo para que lograra el desempeño que se le exigía y permaneciera como empleado del patrono querellado.

70. La Sra. Gladys Molina admitió que los ejecutivos de venta impactan más directo en el área en que se encuentran y que hay ejecutivos de venta que realizan sus ventas en las otras áreas de la Isla.

71. Rondón recibió una "Advertencia Escrita – Desempeño" con fecha de 24 de febrero de 2023.

72. A Rondón se le hicieron los siguientes señalamientos en la advertencia escrita mencionada en el párrafo anterior:

   a. "Al presente usted no está cumpliendo satisfactoriamente con el presupuesto de ventas establecida lo que es una función principal de su puesto". Véase Anejo 12, Advertencia Escrita – Desempeño, con fecha de 24 de febrero de 2023.

   b. "Al evaluar nuevamente tu desempeño al cierre del 31 de diciembre de 2022, no se refleja mejoría significativa al alcanzar una producción de $9,071,201 para un 56.69% de su presupuesto de $16,000,000".

   c. "Durante el 2022 nos reunimos para discutir tu producción. En aquel momento mencionaste que ibas a mejorar tu desempeño. El año 2022 ha sido espectacular la producción total contra presupuesto superó el 125% en dólares y 105% en unidades. Sin embargo, tu producción se mantuvo por debajo de lo esperado. Todos los meses se te informó tu producción, también hablamos en varias ocasiones sobre tu baja producción, se te enviaron informes trimestrales comparando tu producción contra tu presupuesto. Y se te mencionó que tenías que lograr para superar el 70% contra presupuesto". Véase Anejo 12, Advertencia Escrita – Desempeño, con fecha de 24 de febrero de 2023.

   d. "A pesar de los esfuerzos realizados, que incluyeron los informes de producción mensuales y trimestrales, llamada de seguimiento y reuniones "One on One" para informarle del status de producción periódica y clarificarle sus consultas, aún se observan serias deficiencias en su ejecución como Sales Executive. Por

tal motivo, se le ha identificado, nuevamente, como empleado con áreas de pobre desempeño".

   e. A Rondón nuevamente se le indicó que su pobre desempeño "afecta el buen funcionamiento de nuestra unidad, de igual forma, representa una desviación a las Normas de Conducta del Manual de Empleado que expresan: Trabajar eficientemente conforme a las normas de calidad de la institución y de las instrucciones operacionales impartidas por el supervisor. Demostrar interés y sentido de responsabilidad en el desempeño del trabajo".

   f. A Rondón se le exhortó a "corregir de inmediato todo lo antes descrito, ya que de no observar una mejoría sustancial o de usted continuar teniendo situaciones similares o incurriendo en la misma conducta, nos veremos obligados a tomar medidas disciplinarias más estrictas".

73. El 27 de febrero de 2023, el querellante fue colocado en un Plan de Mejoramiento debido a su desempeño durante el año 2022, el cual fue discutido con él.

74. La señora Molina Rivera admitió que el Querellante fue puesto en 2022 en un plan de mejoramiento no empece que estuvo fuera dos meses y que en el año 2021 había cumplido su meta de ventas aun con las limitaciones de su periodo de recuperación.

75. El Plan de Mejoramiento le indicaba a Rondón que "[d]e acuerdo con el desempeño obtenido durante el período de enero a diciembre 2022, logró una producción de $9.1 millones para un 56.69% del presupuesto asignado. Usted no ha cumplido satisfactoriamente con las funciones de su puesto. A pesar de los esfuerzos de seguimiento durante el año, usted no reflejó una mejoría, por lo que le hemos identificado como empleado con áreas de pobre desempeño". Véase Anejo 13, Plan de Mejoramiento.

76. Las áreas de oportunidad identificadas para que Rondón mejorara fueron las siguientes:

   a. "Incrementar el volumen del negocio, de manera que pueda cumplir con el presupuesto asignado para el 2023 de $24 millones".

   b. "Incremento de volumen de contratos de clientes existentes en cartera, brindar seguimiento a clientes 120 días antes del vencimiento para lograr cerrar refinanciamientos o negocios nuevos. En el 2022 solo cerró 104 caso[s] anuales que divide en 8.6 casos nuevos y 1.67 refinanciamientos mensuales de su cartera de clientes. Tener alternativas de ofrecer ofertas para el cambio a unidades nuevas".

   c. "Incremento de clientes nuevos. Mejorar el proceso de venta y cierre con los clientes y personal de los dealers, de manera que los contratos se paguen en o antes de 15 días desde la primera aprobación, durante el 2022 promedió 18 días. Solo cerro un promedio mensual de 3.3 clientes nuevos, 0 40 casos anuales".

   d. "Participación de actividades de sucursales para incremento de referido de clientes". Véase Anejo 13, Plan de Mejoramiento.

77. El Plan de Mejoramiento comenzaría el 6 de marzo de 2023 y sería revisado el 22 de junio de 2023, y se le advirtió a Rondón que "[e]n los próximos meses estaremos evaluando el progreso y cumplimiento de sus

objetivos y de su plan de mejoramiento. De no observar una mejoría sustancial y consistente, se evaluará aplicar medidas correctivas y progresivas".

78. La Sra. Gladys Molina Rivera admitió que una vez identificado el hecho de que un ejecutivo alcanzó una baja en ventas, la responsabilidad de alcanzar un mejoramiento era una compartida entre el empleado y la empresa correspondiéndole a esta última darle apoyo ("support") al empleado y que el mero hecho de notificarle que no había alcanzado la meta no constituye el apoyo correspondiente.

79. La Sra. Gladys Molina Rivera admitió que el supervisor Eduardo Font estaba supuesto a darle asistencia al Querellante, a darle herramientas e identificar formas para que tuviera éxito.

80. La Sra. Gladys Molina Rivera no pudo especificar qué medidas tomó el Supervisor Sr. Eduardo Font para asistir al Querellante en su trabajo para que pudiera alcanzar las metas de venta.

81. La Sra. Gladys Molina Rivera nunca participó en la evaluación del Querellante Edwin Rondón.

82. Al momento del despido del Querellante, la Sra. Gladys Molina Rivera no conocía de su historial de ejecutorias en ventas de modo tal que aun con posterioridad al despido no podía precisar si existía otro año previo al 2019 que se hubiese clasificado el demandado como "low performer".

83. La Sra. Gladys Molina Rivera admitió que no tiene conocimiento de si el Departamento de Recursos Humanos realizó alguna gestión para averiguar el apoyo o asistencia brindando al Querellante por su supervisor directo para mejorar su rendimiento después de todos su todos los años de trabajo y haber logrado las metas correspondientes el año anterior.

84. La Sra. Gladys Molina Rivera admitió que hay empleados clasificados "low performer" que mejoran sus ventas y que por eso se realiza un proceso de seguimiento.

85. Rondón recibió una "Advertencia Escrita Final – Desempeño" con fecha de 5 de julio de 2023. Véase Anejo 14, Advertencia Escrita Final – Desempeño, con fecha de 5 de julio de 2023. 87. A Rondón se le hicieron los siguientes señalamientos en la advertencia escrita mencionada en el párrafo anterior:

   a. "[D]urante el período de enero a mayo de 2023... se han continuado observando serias deficiencias relacionadas a sus responsabilidades principales y desempeño en el puesto que ocupo como Ejecutivo de Ventas".

   b. "Durante dicho período se estableció como meta a los Ejecutivos de Venta cumplir con 32 unidades mensuales y $2,000,000.00 de cierre de presupuesto mensual. En todos los renglones se observa que usted no cumplió con lo mínimo establecido para lograr su incentivo. Además, al no lograr alcanzar las metas refleja en usted un bajo perfil de desempeño según los resultados de la tabla adjunta, con un 39% de producción vs. presupuesto".

   c. "Todo lo antes descrito afecta el buen funcionamiento de nuestra unidad y tiene como consecuencia: 1) se impacta la estrategia de venta y objetivos delineados del negocio, 2) sobrecarga a otros compañeros de trabajo y supervisor en tener que lograr los resultados

que se esperan y 3) se afecta la calidad del servicio a nuestros clientes. Además, representa una desviación a las Normas de Conducta del Manual de Empleados".

d. A Rondón se le exhortó a "corregir de inmediato todo lo antes descrito, ya que de no observar una mejoría sustancial o de usted continuar teniendo situaciones similares, usted será terminado de empleo".

e. El despido del querellante debido a su pobre desempeño

86. El querellante fue despedido de su empleo con Popular Auto el 17 de octubre de 2023.

87. La supervisora Molina Rivera no condujo un "exit interview" al momento del despido del Querellante.

88. En cuanto al año 2023, el Querellante fue despedido antes de que culminara el periodo correspondiente a un año, considerando solo las ventas correspondientes a tres cuartos de dicho periodo.

89. La Sra. Gladys Molina Rivera admitió que no tiene conocimiento sobre si el Departamento de Recursos Humanos de la empresa Querellada tomó en cuenta otros aspectos del desempeño de Querellante más allá del cumplimiento con las metas de ventas.

90. La señora Molina Rivera admitió no recordar nada relativo a las calificaciones que obtuvo el Querellante en los renglones de sus evaluaciones anuales excepto que fue "low performer" en ventas.

91. La Sra. Gladys Molina Rivera admitió que a los empleados clasificados "Low Performer" le daban la oportunidad de escoger entre renunciar o acogerse a un retiro previo.

92. El ejecutivo de ventas José Luis Martínez es uno de los casos de ejecutivos de venta que siendo evaluados como "low performers" se les dió la oportunidad de acogerse al retiro.

93. La Sra. Gladys Molina Rivera admitió que la información sobre el desempeño de los distintos renglones de la evaluación realizada al demandante era una información importante que debía discutirse con el supervisor que llevó a cabo dicha evaluación.

94. La Sra. Gladys Molina Rivera admitió que al Querellante previo a su despido, no se le había suspendido de empleo y sueldo por razones de pobre desempeño o por cualquier otra razón.

95. El Supervisor Eduardo Font admitió que no originó ningún documento o comunicación donde éste recomendara el despido del Querellante.

96. A la fecha de la terminación de empleo de Rondón, de los 22 Ejecutivos de Ventas que trabajaban en Popular Auto para ese momento, todos llegaron o sobrepasaron las metas de ventas establecidas por la empresa para el 2023, excepto por Rondón y Aina Santiago, quien tampoco cumplió con sus metas de ventas y fue colocada en la lista de low performers por su desempeño durante el año 2023.

97. La Sra. Gladys Molina admitió que el Querellante le trajo a su atención que había oficiales de la empresa Querellada que intervenían para que determinados negocios le fueran asignados a otros vendedores y no al Querellante.

98. Alrededor de 2019, la empresa Querellada la empresa nombró como ejecutivo de ventas a Iván Ortiz, quien previamente había fungido como gerente de sucursal del Banco Popular en una sucursal en Mayagüez, quien también comenzó a realizar ventas en el área oeste.

99. El Ejecutivo de Ventas Iván Ortiz Marrero comenzó a cubrir la ruta que previamente cubría el querellante y, para el período de enero a julio 2024, ha sobrepasado las metas de ventas establecidas por la empresa, vendiendo contratos de leasing para 267 unidades, lo que representa un total de ventas de $16,302,354.[7]

De igual forma, el foro *a quo* concluyó que **existe controversia sobre los siguientes hechos esenciales y pertinentes**; si el Recurrido mostraba o no interés y sentido de responsabilidad al realizar sus tareas, la razonabilidad de las métricas impuestas que fueron la razón del despido, si dichas métricas fueron modificadas irrazonablemente por lo que el Recurrido estuvo impedido de cumplirlas. Sobre estos extremos, concluyó el foro primario que la prueba en torno a la disciplina progresiva, alegadamente ejercida por la empresa, fue contradictoria y que no ha encontrado en el expediente la prueba que establezca las medidas correctivas, que en efecto realizó Popular Auto, si alguna. Razona el foro *a quo* que si bien de los hechos incontrovertidos surge que al Recurrido se le advertía que debía corregir algo, su récord no refleja medidas disciplinarias. Además, razona el foro primario que, si bien de las deposiciones y los documentos surge la intención de establecer disciplina progresiva, existe también prueba testimonial que tiende a controvertir la misma. Finalmente, establece el foro primario en la *Resolución* que **es preciso evaluar y adjudicar credibilidad a los testigos, lo que está vedado mediante el mecanismo procesal de sentencia sumaria**.[8]

A base de las anteriores determinaciones de hechos el foro primario concluyó en la Resolución notificada el 2 de abril de 2025

---

[7] *Íd.,* págs. 1018-1029.
[8] *Íd.,* págs. 1030-1031.

que existen hechos esenciales y pertinentes en controversia que impiden la adjudicación sumaria de la Querella por despido injustificado presentada por el Recurrido y que en este caso para adjudicar la controversia es necesaria la celebración de vista en su fondo para dirimir credibilidad y aquilatar la prueba.

Inconforme, Popular Auto presentó el recurso de epígrafe y señala la comisión de los siguientes errores por parte del foro primario:

> Erró el TPI al indicar en su Resolución que existía controversia sobre la razonabilidad de las metas de ventas establecidas por la empresa cuando surge de los hechos incontrovertidos que todos los demás vendedores estaban cumpliendo con sus metas, excepto por el querellante y otra ejecutiva de ventas, motivo por el cual fue despedido.

> Erró el TPI al denegar la MSS de Popular auto cuando la misma demuestra que no existe hecho material alguno en controversia que impida disponer del pleito en su totalidad por la vía sumaria y que procede como cuestión de derecho, convirtiéndose así el TPI en un super departamento de personal cuestionando a *posteriori* la discreción empresarial.

El recurrido compareció ante nos el 7 de mayo de 2025, mediante *Moción en Cumplimiento de Orden de Mostrar Causa.* Allí expone que el foro primario denegó la *Moción de Sentencia Sumaria* presentada por Popular Auto al concluir que no tenía ante si la ítotalidad de los hechos y la verdad de todo asunto relacionado con el despido del Recurrido, particularmente en relación a la razonabilidad de las normas utilizadas para la terminación de su empleo, esencialmente metas de ventas impuestas por el patrono en los últimos cuatro (4) años del empleo del Recurrido así como en la aplicación de dichas metas a las circunstancias particulares del empleo de este. Asimismo el Recurrido concluye que su Supervisor directo no participó de la fijación de tales metas de producción que fueron aumentadas por Popular Auto de $14,500,000 por Ejecutivo de Ventas en el año 2019 a $24,000,000 en el año 2023 y que ello

surge de la determinación sobre hechos incontrovertidos 30 y 31 de la Resolución Recurrida.

Finalmente arguye el Recurrido que el foro primario no incurrió en los errores que señala Popular Auto. Destaca que el foro *a quo* no solo detalló las controversias que hacían necesaria la celebración de una Vista Evidenciaria para determinar aspectos relacionados con la razonabilidad o no del despido del querellante-recurrido, sino que expuso el por qué de la existencia de tales controversias, las que a su juicio no le permitían disponer del caso mediante el mecanismo extraordinario de la Sentencia Sumaria.

## II.
### A. Recurso de certiorari

Es norma reiterada que, el auto *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar a su discreción una determinación de un tribunal inferior. *Orthopedics Prod. Of Puerto Rico, LLC v. Medshape, Inc.*, 207 DPR 994, 1004 (2021). *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020). Véase, también, Artículo 670 del Código de Enjuiciamiento Civil de 1933 de la Ley de Recursos Extraordinarios, 32 LPRA sec. 3491. La característica distintiva de este recurso "se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos". *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 209 (2023); *IG Builders et al.* v. *BBVAPR,* 185 DPR 307, 338 (2012).

Ahora bien, el ejercicio de nuestra discreción judicial no es absoluto. A tales efectos, la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, delimita las instancias que activan nuestras facultades revisoras ante las resoluciones y las órdenes interlocutorias:

> El recurso de certiorari para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el

Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de certiorari en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

A pesar de que la Regla 52.1 de Procedimiento Civil, *supra*, permite revisar las determinaciones interlocutorias recurridas, "la expedición del auto y la adjudicación en sus méritos es discrecional". *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 96 (2008). En consonancia con lo anterior, la Regla 40 del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, preceptúa los criterios para la expedición de un auto de *certiorari*:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

Estas consideraciones orientan la función del foro apelativo para ejercer sabiamente nuestra facultad discrecional. *Rivera et al. v. Arcos Dorados et al., supra,* pág. 209. A su vez, la precitada disposición reglamentaria permite que el análisis revisorio no se

efectúe en el vacío ni en ausencia de otros parámetros. *800 Ponce de León v. AIG, supra*, pág. 176.

En atención a los preceptos discutidos, los tribunales revisores no debemos intervenir en las determinaciones de hechos del tribunal de instancia, "salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad o incurrió en craso abuso de discreción o en error manifiesto". *Citibank et al. v. ACBI et al.*, 200 DPR 724, 736 (2018). Véase, además, *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Así pues, nos corresponde ser cuidadosos y conscientes de la naturaleza de la controversia ante nuestra consideración en tal ejercicio discrecional. *Torres González v. Zaragoza Meléndez*, 211 DPR 821, 849 (2023).

Por último, es menester puntualizar que la denegatoria del auto de *certiorari* no implica la ausencia de error en el dictamen, cuya revisión se solicita, ni constituye una adjudicación en sus méritos. *Torres Martínez v. Torres Ghigliotty*, *supra*, pág. 99. En estos casos, la denegatoria es una facultad discrecional, que evita una intervención apelativa a destiempo con el trámite pautado por el foro de instancia. *Íd.* Por tanto, una vez el foro primario dicte sentencia final, la parte afectada ostentará el derecho para presentar el recurso apelativo correspondiente. *Íd.* págs. 98-99.

### B. *Moción de sentencia sumaria* al amparo de la Regla 36 de Procedimiento Civil

En nuestro esquema procesal, la sentencia sumaria es un mecanismo que permite la ágil disposición de casos sin la celebración de un juicio sujeto a la inexistencia de controversias genuinas de hechos materiales. *Birriel Colón v. Econo y otro*, 213 DPR 80 (2023); *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964, 979 (2022). Su propósito es que los pleitos civiles sean solucionados de forma justa, rápida y económica. *Acevedo Arocho v. Depto. Hacienda y otros*, 212 DPR 335, 350 (2023); *SLG Fernández-Bernal*

*v. RAD-MAN et al.,* 208 DPR 310, 335 (2021). Solo procede su concesión "cuando surge claramente que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia." *Oriental Bank v. Caballero García,* 212 DPR 671, 679 (2023); *Mejías v. Carrasquillo,* 185 DPR 288, 299 (2012).

A esos fines, la Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R.36.1, permite que una parte presente una solicitud de sentencia sumaria respaldada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014); *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 430 (2013). En esa dirección, "un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Oriental Bank v. Caballero García, supra,* pág. 679.

A tales efectos, la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36. 3, prescribe los requisitos de forma atinentes a esta moción y su respectiva oposición. *Universal Insurance Company v. Estado Libre Asociado de Puerto Rico,* 211 DPR 455, 472 (2023). En lo concerniente, el precitado cuerpo reglamentario fija las formalidades que debe exhibir una petición de tal naturaleza: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia, así como de cualquier otro documento admisible en evidencia que se

encuentre en el expediente del tribunal; (5) las razones por las cuales debe ser dictada la sentencia argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. Regla 36.3(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(a).

De manera similar, la parte opositora de la sentencia sumaria "tiene que cumplir con los requisitos de la Regla 36 de Procedimiento Civil". *Oriental Bank v. Caballero García, supra*, pág. 680. No debe adoptar "una actitud pasiva y descansar en las aseveraciones o negaciones que consigne en su alegación". *Íd.* Al contrario, le compete, "como parte de su carga, puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte una sentencia sumaria en su contra". *León Torres v. Rivera Lebrón*, 204 DPR 20, 44 (2020). Por tanto, enumerará los hechos materiales de buena fe controvertidos y aquellos sobre los que no media controversia. *Oriental Bank v. Caballero García, supra.*, pág. 680. También, indicará los párrafos o páginas de la prueba documental que establezcan o impugnen cada hecho. *Íd.* Asimismo, identificará "los argumentos del derecho aplicable por los cuales no se debe dictar la sentencia*". SLG Fernández-Bernal v. RAD-MAN et al, supra,* pág. 336. Acatados tales requisitos procesales, "el tribunal debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la moción en oposición, así como los que obren en el expediente del tribunal". *Ramos Pérez v. Univisión*, 178 DPR 200, 210 (2010); *Cruz Marcano v. Sánchez Tarazona*, 172 DPR 526, 550 (2007). En cuanto a los documentos presentados, estos deben analizarse de la forma más favorable para la parte promovida, concediéndole así el beneficio de toda inferencia razonable que se pueda derivar de ellos. *Medina v. M.S. & D. Química P.R., Inc.,* 135

DPR 716, 734 (1994); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714, 721 (1986).

No obstante, **la normativa imperante no recomienda emplear el mecanismo sumario en aquellos casos en los cuales median elementos subjetivos de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial para dilucidar la controversia**. *Segarra Rivera v. Int'l Shipping et al., supra,* pág. 980; *Soto v. Hotel Caribe Hilton,* 137 DPR 294, 301 (1994). (Énfasis nuestro). Ahora bien, amerita su concesión "si el juzgador queda claramente convencido de que tiene ante sí, de forma no controvertida, todos los hechos materiales pertinentes y que una vista en los méritos es innecesaria". *Birriel Colón v. Econo y otro, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra,* pág. 337.

Por último, conviene puntualizar que, los tribunales revisores nos encontramos en igual posición que el Tribunal de Primera Instancia para determinar si procede una sentencia sumaria. *Birriel Colón v. Econo y otro, supra; Meléndez v. Bohío ,* 193 DPR 100 (2015).

Nuestra facultad se limita a examinar de *novo* el expediente y verificar que se cumplan las exigencias de la Regla 36.3 de Procedimiento Civil. *Fernández Martínez v. RAD-MAN San Juan III-D, LLC; supra*, pág. 338; *Rivera Matos et al. v. Triple-S et al.*, 204 DPR 1010 (2020). No obstante, destacamos que el foro apelativo solo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González v. M. Cuebas,* 193 DPR 100, 114 (2015). Así pues, **carecemos de la facultad para adjudicar hechos materiales en disputa, pues esa tarea concierne al foro primario**. Íd., pág. 115. (Énfasis nuestro).

**III.**

Como cuestión de umbral, es preciso mencionar que conforme a la Regla 52.1 de Procedimiento Civil, *supra,* este Tribunal tiene discreción para atender el presente recurso toda vez que es una *Resolución* que deniega una moción de carácter dispositivo. Sin embargo, y a pesar de que este es susceptible de revisión, de conformidad con la Regla 52.1 de Procedimiento Civil, *supra,* determinamos denegar su expedición.

Es la contención principal de Popular Auto en el recurso de epígrafe que a la luz de la relación de hechos incontrovertidos procedía que el foro primario emitiera sentencia sumaria a su favor y nos invita a realizar un ejercicio de revisión de *novo.*

Sin embargo, el foro primario concluye en la *Resolución* recurrida que procede denegar la solicitud de sentencia sumaria presentada por Popular Auto toda vez que en este caso existe controversia sobre hechos materiales esenciales, por lo que es preciso evaluar y adjudicar credibilidad a los testigos para hacer determinaciones sobre los hechos en controversia, lo que está vedado mediante el mecanismo procesal de sentencia sumaria.

A la luz de ese contexto, conviene repasar que nos encontramos en igual posición que el foro primario para atender la solicitud de sentencia sumaria.  Sin embargo, en esta ocasión el ejercicio discrecional nos exige no intervenir en la determinación judicial recurrida. Advertimos, pues, que en casos de sentencia sumaria carecemos de facultad para adjudicar aquellos hechos materiales en disputa, pues esa tarea concierne al foro primario. *Meléndez González v. M. Cuebas, supra,* pág. 115.

Así puntualizado, determinamos, tras examinar sosegadamente la totalidad del expediente ante nos, que nos corresponde abstenernos de ejercer nuestras facultades revisoras en esta etapa interlocutoria. Pese a que la Regla 52.1 de Procedimiento

Civil, *supra*, nos concede la facultad para examinar la denegatoria de la moción de sentencia sumaria en cuestión, decidimos no intervenir en esta etapa a los fines de evitar cualquier pronunciamiento a destiempo.

Por último, recordemos, pues, que nuestro ordenamiento jurídico nos habilita exclusivamente a intervenir en aquellas etapas interlocutorias en las cuales medie una actuación arbitraria o caprichosa, un ejercicio de craso abuso de discreción, o una errónea interpretación o aplicación del derecho por parte del foro primario. No obstante, en el recurso presente no contemplamos indicios de tales escenarios a tenor con los parámetros orientativos de la Regla 40 del Tribunal de Apelaciones, *supra*. Por tanto, denegamos la expedición el auto de *certiorari*.

Luego de evaluar la totalidad del expediente y la fundamentada *Resolución* del foro *a quo*, a la luz de los criterios de la Regla 40 del Tribunal de Apelaciones, *supra*, no identificamos razón por la cual este Foro deba intervenir con el dictamen recurrido. Ello, ya que no se configura ninguna de las situaciones que allí se contemplan. Recordemos que nuestro ordenamiento jurídico nos brinda la discreción de intervenir en aquellos dictámenes interlocutorios en los que el foro *a quo* haya sido arbitrario, cometido un craso abuso de discreción o cuando, de la actuación del foro, surja un error en la interpretación o la aplicación de cualquier norma procesal o de derecho sustantivo. Reiteramos que en el recurso que aquí atendemos no se nos ha demostrado que estemos ante alguno de estos escenarios. Queda claro que al denegar a expedición del auto, no prejuzgamos los méritos del caso.

**IV.**

Por los fundamentos antes expuestos, ***denegamos*** la expedición del auto de *certiorari*.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones